IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRENDA MOTE,[1]           )
                          )
         Plaintiff,       )
                          )
    v.                    )   No. 05 C 6212
                          )
AETNA LIFE INSURANCE COMPANY,  )
et al.,                   )
                          )
         Defendants.      )

## MEMORANDUM OPINION AND ORDER

Brenda Mote ("Mote") brings this action under a provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B).[2] Mote seeks reinstatement of disability payments under that ERISA section pursuant to the Arthur Andersen LLP Group Long Term Disability Insurance Plan ("Plan"), as underwritten by Aetna Life Insurance Company ("Aetna"). Although Mote has named both the Plan and Aetna as defendants, Aetna is not a proper party under <u>Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan</u>, 378 F.3d 669, 674 (7th Cir. 2004), which held that a claim for ERISA benefits "generally is limited to a suit against the Plan." To be sure, Aetna collected all of Mote's medical information, made all of the determinations

---

[1] During the course of the events described in this opinion, Mote underwent a divorce proceeding and returned to that maiden surname. Even though some of the documents at issue have used her married name, Brenda Meisinger, to avoid confusion this opinion (like the pleadings) will refer to her as Mote.

[2] All further ERISA provisions are cited "Section--," using the Title 29 numbering.

about her medical condition and communicated those decisions to Mote, but it did so as agent for and on behalf of the Plan. Hence this Court is obligated to attribute Aetna's decision-making process to the Plan (see Blickenstaff, 378 F.3d at 672 n.1). Mote's claim against Aetna is therefore dismissed.[3]

As between Mote and the Plan, each has now moved for summary judgment under Fed. R. Civ. P. ("Rule") 56 and has relatedly complied with this District Court's LR 56.1.[4] Their cross-motions are fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, the Plan's motion is granted, Mote's motion is denied and this action is dismissed.

## Summary Judgment Standard

Every Rule 56 movant bears the burden on her or its Rule 56 motion of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

---

[3] Although Mote's able counsel adduces some caselaw (principally nonprecedential district court opinions) that point in the opposite direction, a different ruling would make no difference because Mote loses on the merits in any event.

[4] Mote suggests alternatively, though without a separate motion, that this Court should apply Rule 52, which allows the Court to weigh the evidence and enter findings of fact and conclusions of law--thus essentially conducting a bench trial or a trial on the papers. Rule 52 does authorize a trial court to enter a judgment on a stipulated record (Sherwood v. Wash. Post, 871 F.2d 1144, 1147 n.4 (7th Cir. 1989)), but here the Plan has not consented to a bench trial, preferring to have this Court render an opinion on summary judgment.

(1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.2002)).

As this Court has said in Coles v. LaSalle Partners Inc. Disability Plan, 287 F.Supp.2d 896, 900 (N.D. Ill. 2003):

> Those requirements often present an insurmountable hurdle when applied to cross-motions for summary judgment.

No such insurmountable hurdle exists here, even though this review of the Plan in the summary judgment context under the requisite deferential standard creates a unique situation, for it requires a determination of the reasonableness of the Plan's decision even while all reasonable inferences are drawn in Mote's favor.

## Statement of Facts[5]

Mote worked as a Human Resource Generalist with Arthur Andersen until April 10, 1998, when she ceased working because she became incapable of performing her job due to back pain and

---

[5] LR 56.1 facilitates the resolution of summary judgment motions by highlighting the existence or nonexistence of factual disputes. Where as here cross-motions are involved, both parties must submit evidentiary statements and responses with record citations, and the parties have conformed to that requirement. This opinion cites to the parties' jointly submitted exhibits to the affidavit of Maryanne Barry as "AP Ex. -- at --" and to Mote's factual appendix to her initial memorandum as "M. App. at --." Those same "AP." and "M." abbreviations are used as to the parties' memoranda ("Mem.").

3

physical complications, including fibromyalgia, stemming from an accident she had suffered in August 1997 (M. App. at 1, 6). Based on a period of eligibility beginning on April 11, she began to receive long-term disability benefits on July 10, 1998 under the Arthur Andersen Long-Term Disability ("LTD") Plan, on the premise that she was totally disabled due to severe back pain and fibromyalgia (id. at 1).

On December 8, 2003 the Plan notified Mote that it had recently reevaluated her claim and, upon reviewing the information in her file, had determined that she no longer met the Plan requirements for total disability (M. App. at 1). Under the Plan "total disability" has a two-tiered definition that means (AP. Ex.1 at 1206):

> For Active Regular Employees with a job class below manager, that solely because of an illness, pregnancy or accidental bodily injury, an insured employee is unable:
>
> (1) During the first 5 years of disability to perform the material duties of the employee's own occupation; and
>
> (2) From then on, to work at any occupation for which such employee is, or may reasonably become, fitted by education, training or experience.

Because Mote had been on disability for over five years, the Plan evaluated her claim under the second (and more stringent) alternative, analyzing whether she was capable of "work[ing] at

4

any occupation."[6] Ultimately the Plan found Mote had the functional capacity to perform the material duties of a relatively sedentary occupation,[7] if not her own former position (M. App. at 1). Mote appealed that decision and submitted reports from her treating physicians, Drs. West and Gruft (id.) Notes from those physicians said they had evaluated her condition and found she was suffering from a "class 5" physical impairment, which rendered her "incapable of minimal (sedentary) activity" (id. at 78, 89).

Seeking assistance in evaluating Mote's medical records, the Plan forwarded them to independent medical consultant Dr. William Hall, who concluded on September 2, 2004 that "the weight of medical credibility be given to the opinions of Brenda [Mote's] treating physicians and that, absent medical or personal information regarding Ms. [Mote] to the contrary, her subjective musculoskeletal symptoms are of such severity as to be totally medically limiting" (AP. Ex.3 at 626). Later, however, Dr. Hall reviewed surveillance videotapes of Mote that had been shot on

---

[6] Although this issue need not be addressed in terms of the conclusion reached here, the just-quoted language does not of course tell the whole story. Caselaw in this area gives substantive content to the "fitted by education, training or experience" requirement.

[7] Under the Plan sedentary work "entails occasionally lifting up to 10 pounds...[and] involves sitting most of the time, but may involve walking or standing for brief periods of time" (AP. Ex. 3 at 5).

5

January 29 and February 4, 2003, which depicted her running errands, driving an elderly relative to doctors' appointments and loading groceries into her car (id. at 626-28). That led Dr. Hall to revise his original opinion in these terms on September 16, 2004 (id. at 628):

> After viewing surveillance videos of Brenda [Mote's] activities for the dates and durations noted, I do not agree with assessments of severity or with medically limiting conclusions by Ms. [Mote's] treating physicians.

On September 28, 2004 the Plan notified Mote that after a "full and fair review of the decision to terminate [her] claim" it was upholding its decision to cut off her LTD benefits (AP. Ex.1 at 5). To that end the Plan had reviewed a host of materials: office notes and records from Mote's treating physicians (Drs. West, Gruft, Craig, Rodriguez, Reilly and Boury); an independent report from the Plan's outside consultant, Dr. Hall; surveillance tapes taken of Mote during 2004; independent medical evaluations by Drs. Richard Tuttle and Troy Karlsson, both of whom had examined Mote personally; Mote's November 2002 and September 2003 functional capacity evaluations; the evaluation prepared by psychiatric and neurologic specialist Dr. Walter DeFoy; and the evaluation prepared by Dr. Paul Raford, a specialist in occupational medicine (M. App. at 1-7). According to the Plan, "the weight of the medical information does not support a condition of total disability" (AP. Ex.1 at

7).  When the Plan notified Mote of its final decision to discontinue her benefits, she commenced this lawsuit.

## Standard of Review

It is not disputed that the Plan is an "employee welfare benefit plan" as defined by Section 1001(1)(A), and Mote is entitled to judicial review of the Plan's decision.  Under the seminal teaching of <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), such review of the Plan's final decision is de novo unless the Plan has reserved discretion to its administrator to determine when benefits are due or to interpret the Plan provisions, in which event the court examines the record only to ensure that the decision was not arbitrary and capricious (<u>id</u>. at 109-11).  To obtain such limited review a plan must "contain language that...indicates with the requisite if minimum clarity that a discretionary determination is envisaged" (<u>Herzberger v. Standard Ins. Co.</u>, 205 F.3d 327, 331 (7th Cir. 2000)).

Here the Plan policy grants Aetna the "discretionary authority" to both "determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy" (AP. Ex.1 at 1197).  That language explicitly spells out Aetna's discretionary authority both to make benefits determinations and to interpret the Plan's language.  Additionally, the policy

7

specifically states that "Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously" (id.).[8]

So this Court must decide whether the Plan's denial of Mote's claim for long-term disability was arbitrary and capricious. As Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 773 (7th Cir. 2003) instructs, the "arbitrary and capricious" standard is the proper standard of review when the ERISA plan gives its administrator discretionary authority over benefit determinations (as is true here). Under that deferential standard a court must not overturn the Plan's decision if, as Hess v. Hartford Life & Accident Ins. Co., 274 F.3d 456, 461 (7th Cir. 2001)(internal citations omitted) puts it:

> (1) it is possible to offer a reasoned explana-
> tion, based on the evidence, for a particular
> outcome, (2) the decision is based on a reasonable
> explanation of relevant plan documents, or (3) the
> administrator has based its decision on a
> consideration of the relevant factors that
> encompass the important aspects of the problem.

This Court must not set aside the Plan's decision so long as

---

[8] Effective January 1, 2003 the Plan policy language was amended to include the following (M. Ex. 1 at 8):

> In exercising such fiduciary responsibility, Aetna will
> have the sole discretionary authority to determine
> entitlement to Plan benefits as determined by the Plan
> Documents for each claim received and to construe the
> terms of the Plan.

8

it is based on "a reasonable interpretation of the relevant plan documents" (O'Reilly v. Hartford Life & Accident Ins. Co., 272 F.3d 955, 960 (7th Cir. 2001)). To put the same concept in somewhat different language, "we do not ask whether the administrator reached the correct conclusion or even whether it relied on the proper authority. Instead, the only question for us is whether the administrator's decision was completely unreasonable" (Kobs v. United Wis. Ins. Co., 400 F.3d 1036, 1039 (7th Cir. 2005)(citation omitted)). Courts are also charged with determining whether administrators have given "full and fair assessment of claims" as well as "clear communication to the claimant of the specific reasons for benefit denials" (Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003)("Black & Decker")(internal citations omitted)).

## Mote's Contentions

Mote advances several arguments to urge that the Plan's decision was arbitrary and capricious. Principal among those arguments is her contention that her treating physicians, Drs. West and Gruft, examined her on several occasions and determined that she was unable to work full-time at a sedentary job. But Kobs, 400 F.3d at 1039 teaches that "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." Black & Decker, 530 U.S. at 831 similarly counsels that ERISA does not "impose a heightened burden of

9

explanation on administrators when they reject a treating physician's opinion."  In sum, the Plan was free to determine that Mote was capable of working despite what her treating physicians advised.

Moreover, as <u>Leipzig v. AIG Life Ins. Co.</u>, 362 F.3d 406, 409 (7th Cir. 2004) recognizes, "[m]ost of the time, physicians accept at face value what patients tell them about their symptoms; but insurers...must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)."  For that reason the Plan took the additional step of having its independent consultant review Mote's records, as well as having Dr. Richard Tuttle conduct a independent medical evaluation of Mote (M. Ex. 1 at 6).  Dr. Tuttle found that she "had significant nonorganic physical signs, including superficial tenderness which is nonspecific and rather diffuse and nonanatomic" (<u>id</u>.) and concluded that "there was no obvious evidence for ongoing pathological process" (<u>id</u>. at 6-7).  Based in part on Dr. Tuttle's opinion, the Plan determined that there was insufficient evidence to determine that Mote should be precluded from working full-time in a sedentary occupation (see <u>id</u>. at 7).

Mote also argues that the Plan acted arbitrarily and capriciously because it terminated her benefits after having paid them for five years.  That position is devoid of merit--after

all, the Plan policy specifies that the definition of "total disability" changes after five years, at which time the Plan was surely entitled to determine that Mote could work at "any" occupation, even if she were not capable of returning to her former position.

Mote also contends that a determination by the Social Security Administration ("SSA") that she was in fact "disabled" for purposes of its statute should call for a decision in her favor here. In that respect <u>Reich v. Ladish Co.</u>, 306 F.3d 519, 524-25 (7th Cir. 2002) does authorize a court to consider SSA determinations as relevant where an ERISA plan specifically includes SSA disability as a condition of plan disability. But here Mote did not provide the SSA materials to the Plan before it decided to terminate her benefits--and even if she had done so, the SSA decision would not be binding on the Plan. Indeed, <u>Black & Decker</u>, 538 U.S. at 833 distinguished disability determinations by the SSA, which are measured against "a uniform set of federal criteria," from ERISA disability determinations that (quoting <u>Firestone Tire</u>, 489 U.S. at 115) are "likely to turn, in large part, on the interpretation of terms in the plan at issue."

Mote's next argument--that the Plan's partial reliance on surveillance videotapes of her activities was improper--is torpedoed by <u>Shyman v. Unum Life Ins. Co.</u>, 427 F.3d 452, 456 (7th Cir. 2005), which approved a plan's decision to hire a private

11

detective to surveil a claimant and resolve inconsistencies in his file. Taking a leaf from that book, the Plan used surveillance videotapes as one of the evidentiary items it evaluated during its review of Mote's claim, and those videotapes showed Mote grocery shopping, lifting packages and driving for 25 and 45 minutes at a time (AP. Ex.3 at 318-25, 545). Those activities materially undercut her treating physicians' diagnoses that she was "incapable of minimal sedentary activity," and that she cannot sit for more than "15-20 minutes" (see, e.g., M. Ex. 1 at 302), suggesting that her treating physicians may have taken her word at face value without employing the same level of skepticism as the Plan evaluators.

Mote, citing to nonbinding authority, urges that the Plan's reliance on surveillance tapes is an "abuse of discretion." It is true that if the Plan had arrived at its decision by relying solely on the surveillance tapes without any reasoned analysis of the additional doctors' reports or evaluations, then its decision-making process might be labeled as arbitrary and capricious. But that was not at all the case here. Instead the Plan viewed the tapes in the context of all the other material in Mote's records and against the backdrop of the more stringent definition of "total disability" that applied to her claim. For example, in Mote's functional capacity evaluation conducted on November 11, 2002, the evaluator found that "[a] series of

12

inconsistencies" appeared to "suggest that [Mote] may be capable of performing at greater work capacities than what she exhibited during the course of evaluation" (M. Ex. 1 at 602). All in all, it cannot be said that the Plan denied Mote's benefits arbitrarily and capriciously.

Most fundamentally, Mote has really glossed over the highly deferential standard of review that this Court must apply to the Plan's decision. Once again, Aetna reviewed all of the medical data--both from Mote's doctors and from independent sources--as well as the surveillance tapes and the functional capacity evaluations. By engaging in that exhaustive process en route to a reasoned decision as to Mote's claim, the Plan has "articulate[d] a rational connection between the facts found, the issue to be decided and the choice made," a requirement reconfirmed by Blickenstaff, 378 F.3d at 680.

At the risk of repetition, a decision in the Plan's favor is compelled by (1) the evidence showing that the Plan engaged in the deliberative process, (2) the existence of medical evidence in support of that decision, (3) the language of the Plan policy itself and (4) the limited scope of judicial review. There are no allegations that the Plan acted in bad faith or had a conflict of interest. Instead the record compels the conclusion that the Plan made a good faith effort to reconcile the surveillance tapes, the multiple functional capacity evaluations and the other

documentation. For her part, Mote has been unable to show that the decision was arbitrary and capricious. Hence this Court affirms the Plan's denial of Mote's long-term disability claims and grants summary judgment in favor of the Plan and against Mote.

## Attorneys' Fees

Finally the Plan argues that it is entitled to the award of reasonable attorneys' fees. On that score Hess, 274 F.3d at 464 acknowledged the "modest presumption that the prevailing party in an ERISA case is entitled to a fee" and reconfirmed that trial courts have the discretion to award them after contemplating "the bottom-line question":

> Was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?

In that respect the Plan has not taken the stance that Mote acted in bad faith or simply to harass it. Instead the Plan has more tepidly stated that "[t]he documentation did not support Ms. Mote's claim that she satisfied the Plan's definition of disability" (AP. Mem. 20). But that aside, the extended period during which Mote received benefits without cavil, coupled with the strong limiting opinions from Mote's treating physicians, support the reasonable bona fides of Mote's claim--even though it has proved unsuccessful. In sum, this Court denies the request for an award of attorneys' fees to the Plan.

<u>Conclusion</u>

Because Mote has been unable to establish that there is a genuine issue of material fact to rebut, under the requisite deferential standard, the Plan's adverse decision, the Plan's motion for summary judgment is granted. This Court therefore affirms the Plan's decision to terminate Mote's disability benefits, based on its determination that she could work full-time at a sedentary occupation. Mote's cross-motion for summary judgment is of course denied.

                                            _____
                                            Milton I. Shadur
                                            Senior United States District Judge

Date:   November 3, 2006